IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED
MAR 2 8 2003

| | |
|---|---|
| WILLIAM FANSLOW, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 01 C 3558 |
| | ) JUDGE WILLIAM J. HIBBLER |
| CHICAGO MANUFACTURING CENTER, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Fanslow ("Fanslow") filed this action against his former employer Chicago Manufacturing Center ("CMC"), alleging retaliatory discharge and wrongful termination in violation of 31 U.S.C. § 3730(h) and 740 ILCS 175/4(g). Fanslow claims that he was discharged in retaliation for engaging in whistleblowing activities protected by the False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq.* CMC moves for summary judgment, contending that Fanslow's termination was based on legitimate, non-pretextual reasons. For the following reasons, CMC's motion for summary judgment is **GRANTED**.

### STATEMENT OF FACTS

CMC is a non-profit corporation engaged in the business of serving as consultants to meet the needs of small and medium sized manufacturing enterprises. CMC was established as part of a program called the Manufacturing Extension Plan ("MEP"), under the auspices of the National Institute of Standards and Technology ("NIST"), an agency of the United States Department of Commerce. CMC is funded by client fees and other public sources such as the

1



State of Illinois, City of Chicago and NIST. Specifically, NIST provides approximately 47% of CMC's funding.

CMC hired Fanslow in October 1996, as its senior program manager. In that position, Fanslow's primary objective was to consult with CMC clients on information technology and improving their management information systems. Fanslow reported directly to Rosemary Cudzewicz, CMC's Vice President of Operations. In June 1997, Cudzewicz evaluated Fanslow's performance, finding that he did not meet all of his designated "quantitative" goals. Overall, however, Fanslow received an "exceeds job requirements" rating and a raise. In April 1998, Fanslow was promoted to Director of Information Technology. This role required Fanslow to, among other things, focus more on CMC's internal information technology systems.

In June 1998, Cudzewicz left CMC and Fanslow began reporting to Demetria Giannisis, CMC's President. Fanslow's responsibilities as IT director expanded to include managing both the internal and external IT functions for CMC. As the Director of IT, Fanslow's initial focus centered on identifying a new customer relations management system ("CRM"), as the system in place at that time was widely considered deficient. By the fall of 1998, CMC had begun to move forward with implementing a CRM dubbed the VAULT system. Fanslow's team, the IT staff, worked on the implementation under his direction. By the fall of 1999, implementation of the VAULT system was essentially complete.

In October 1999, Fanslow and Giannisis met to discuss and set year 2000 goals for the IT group. Giannisis further expanded Fanslow's duties as Director of IT, and increased his salary substantially. One of the issues specifically mentioned was stabilizing the VAULT system, as serious problems had arisen with regard to getting the new system off the ground. VAULT was an essential tool in CMC's business that employees used on a daily basis in order to collect data on potential and existing clients and generate internal and external reports.

Throughout the spring and summer of 2000, though, CMC employees continued to complain about frequent crashes of the VAULT system, and difficulties in obtaining information from the database. As a result, CMC began generating late reports which contained a series of errors. Fanslow knew that Giannisis looked to him for expertise in dealing with IT issues at CMC and that she held him accountable, as Director of IT, for the ongoing problems with the VAULT system. In addition, in spring 2000, Giannisis began expressing concerns to Fanslow about the lack of sales from his group.

On July 24, 2000, Fanslow, Giannisis, and David Swirnoff, CMC's Director of Human Resources, met. Giannisis told Fanslow he was being placed on a performance action plan ("PAP"). On July 31, 2000, Fanslow received a draft version of the PAP, suggesting several action steps designed to correct the internal and external IT issues identified by Giannisis. Fanslow submitted written comments in response to the draft. On August 7, 2000, Fanslow received a modified PAP. The following day, Fanslow sent a memorandum to Giannisis in which he acknowledged problems with the VAULT system, but nonetheless contended that her criticisms of his performance were unfair and wrong. Fanslow suggested that CMC retain an independent consultant to review the issues for which he was being criticized. CMC sent Fanslow the final version of his PAP on August 28, 2001.

In response to Fanslow's recommendation, in late August or September 2000, a consulting group was brought in to evaluate CMC's IT Department, particularly the VAULT system. The consulting team initially noted that the problems CMC was experiencing were common, but recommended that the company not look at other applications vendors at that time. In a subsequent written report, the consulting team again identified several problems with the VAULT system, but found no major flaws with the application software. Rather, the consulting team suggested, CMC management might need to change ancillary processes such

as data quality, user training and support, user reporting, and management commitment. In November 2000, CMC retained an outside consultant to assist with IT operations and the implementation of the consulting team's audit results.

On or about December 11, 2000, Fanslow was called to a meeting with Giannisis, Swirnoff and the IT consultant. Fanslow was told that Brian Ferrentino, CMC's Network Administrator and a member of the IT group, had complained about Fanslow using profanity toward him. Fanslow admitted that he became upset with Ferrentino because of his lack of performance on the job, and told him that he "needed to get his f—ing butt in gear and be part of the team." (Fanslow Dep. Tr. at 118-120). When questioned by Giannisis and Swirnoff about the incident, Fanslow responded with "what's the big deal." According to Fanslow, the use of obscenities was commonplace at CMC and the whole incident was blown out of proportion. Giannisis and Swirnoff state that they viewed Fanslow's behavior as unprofessional conduct involving a subordinate employee. They claim that upon consideration of that incident and the ongoing performance issues documented in the PAP, they decided to end his employment. The next day, December 12, 2000, Giannisis told Fanslow that she did not feel he was happy with his employment at CMC and therefore he was being terminated.

Fanslow claims that the real reason for the PAP and his subsequent termination was neither performance issues nor misconduct. Instead, Fanslow contends, he was fired in retaliation for refusing to support illegal conduct engaged in by Giannisis and John Panfil, CMC's Vice-President, and for having reported their activities to NIST in November 1999. Fanslow says that sometime prior to November 1999, Panfil told him about MFR.NET, a for-profit dotcom startup with which he and Giannisis were both involved. Fanslow claims that NIST had made clear that MEPS such as CMC could train their clients on e-business concepts such as web design, web hosting and e-business solutions, but were not permitted to provide

4

the actual services such as website design and hosting. Fanslow believed Panfil and Giannisis intended to launch MFR.Net as a service provider for CMC clients.

Fanslow had attended a meeting in November 1999 at which Ned Ellington, a NIST official, was present. According to Fanslow, Ellington stated that NIST did not want MEPS doing any type of spin-off dotcom start-up companies. After the meeting, Fanslow asked Ellington if he was aware of the MFR.Net initiative at CMC, and Ellington reiterated that NIST did not want its funds used for that purpose. Fanslow subsequently told Dave Adams, CMC's Director of Finance, Panfils and Giannisis about his conversation with Ellington. Fanslow claims that after he raised concerns about the "illegal diversion of CMC funds to MFR.Net" in November 1999, Giannisis began to harass him about IT issues and eventually terminated him in retaliation for his "whistleblowing" activities.

To further support his retaliation claim, Fanslow points to an incident in June or July 2000 when Panfil allegedly directed him to purchase computer hardware for MFR.Net, and to charge the hardware to CMC. Fanslow says he initially refused to do so, telling Panfil that was an unallowable cost, but after Giannisis pressured him to sign the requisition, he acquiesced. Finally, Fanslow mentions a July 17, 2000 kickoff meeting for MFR.Net where members of the IT group questioned the relationship between CFC and the MFR.Net. However, Fanslow concedes that he made no comments during the meeting about MFR.Net. Indeed, from the time of the meeting in July 2000 to December 2000 when Fanslow was terminated, Fanslow admits that he did not raise concerns with CMC management about the propriety of MFR.Net.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the record reveals that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp 2d 1034,1042 (N.D. Ill. 1998), *aff'd*, 183 F.3d

5

730 (7th Cir. 1999). A genuine issue of material fact exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, the Court evaluates all admissible evidence in the light most favorable of the nonmoving party. *Id. at 255.* The moving party bears the initial responsibility of demonstrating that summary judgment in its favor is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To avert summary judgment, then, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. A party cannot create an issue of fact by contradicting his own earlier statement without a plausible explanation for the change. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 533 (7th Cir. 1999). Summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## ANALYSIS

### I. Retaliation under the False Claims Act

Fanslow contends that CMC retaliated against him in violation of 31 U.S.C. 3730(h), which provides, in relevant part, that:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

To establish a retaliatory discharge claim under § 3730(h), Fanslow must show that (1) he engaged in conduct protected under the FCA; (2) CMC knew he was engaging in such protected conduct; and (3) CMC's discharge decision was motivated, at least in part, by the

6

protected conduct. *Brandon v. Anesthesia & Pain Mgmt. Assoc. Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *Luckey*, 2 F. Supp. 2d at 1050.

### A. Protected Conduct by Fanslow

Congress has made clear that whistle-blower protections should extend to almost any type of activity. *Luckey*, 2 F. Supp. 2d at 1051. The FCA expressly covers investigatory activities preceding litigation and ... the "filed" or "to be filed" language provides protection to events "as they were understood at the time of the investigation or report." *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994). Therefore, protected activity under the FCA should "be interpreted broadly." *Luckey*, 2 F. Supp. 2d at 1051, *quoting* S. Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.A.N.N. 5266, 5299. Nevertheless, the employee must show that his purpose for engaging in the activity was "in the furtherance of an action" under the FCA. *Luckey*, 2 F. Supp. 2d at 1051. Indeed, "[t]he statute's whistle blower protections are aimed at employees 'exposing fraud' or attempting to 'expose fraud,' not employees with concerns wholly detached from the purportedly fraudulent activity." *Id.*

Fanslow asserts that he engaged in FCA protected conduct when he brought to the attention of a NIST official CMC's alleged unlawful diversion of funds and resources to establish MFR.Net. CMC, on the other hand, maintains that Fanslow's conduct consisted of only conversations and meetings which never reached the investigatory level necessary for a FCA action. In *Luckey*, the court explained that a viable claim under § 3730(h) requires a showing that the purpose of the employee's investigatory activity contained at least some ingredient of uncovering fraudulent activity." *Id.* There, the plaintiff's claim failed because her investigation focused solely on regulatory non-compliance, and not a fraud upon the government. *Id. See also Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) (correcting regulatory problems not "in furtherance of" a FCA action).

In contrast, in *Yesudian v. Howard Univ.*, 153 F.3d 731 (D.C. Cir. 1998), the appellate court reversed the lower court's grant of judgment as a matter of law in favor of the defendant, finding, in relevant part, that the plaintiff's numerous complaints to upper-level University officials about financial improprieties in the Purchasing Department, showed that he was engaged in an investigation of false or fraudulent claims. Plaintiff presented evidence that, among other things, his supervisor falsified time and attendance records, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, and permitted payments to vendors who did not provide services to the University. *Id.* at 740. Because plaintiff knew that the University received over 80% of its funding from the federal government and was authorized to make purchases through the General Services Administration, the appellate court found, he possessed a good faith belief that false claims had been submitted to the federal government. *Id.* at 740.

The *Yesudian* court rejected the notion that the protected conduct element of a FCA claim required plaintiff to have actually developed a winning *qui tam* action before he could establish retaliation. *Id.* at 739. Rather, the court emphasized, Congress intended "to protect employees while they are collecting information about a possible fraud." *Id.* at 740. As long as plaintiff was investigating matters that could reasonably lead to a viable FCA case, the court held, plaintiff's actions were protected. *Id.* (collecting cases). *See also Neal*, 33 F.3d at 864 (holding that §3730(h) covers a situation where litigation was a "distinct possibility" or "could be filed legitimately").

Fanslow presents a much weaker case for a finding of protected activity than the plaintiff in *Yesudian*. Certainly Fanslow's investigation of fraudulent activity was not very extensive. He inquired of a NIST official in November 1999 about CMC establishing MFR.Net, and learned that NIST did not want its funds used for that particular purpose. While Fanslow

now claims in his affidavit that he also told the NIST official that CMC had been illegally diverting NIST funds to MFR.Net, he failed to raise this point at his deposition, and provides no explanation for his sudden recall of such a crucial fact. The Court therefore will disregard this new evidence.[1] At best, then, Fanslow learned after the November 1999 meeting that CMC might be violating NIST procedures. In that respect, his case could be considered similar to the situation in *Luckey*, since Fanslow was concerned with unallowable conduct, not a fraud on the government. On the other hand, *Yesudian* makes it clear that a plaintiff need not even know that the investigation he is pursuing could lead to a FCA suit. *Id.*, 153 F.3d at 741. In other words, even if the evidence ultimately reveals that CMC did not engage in fraudulent activity, Fanslow's actions in investigating that possibility can nonetheless be protected under the statute. *Id.*

On summary judgment, the Court must err in favor of the nonmoving party. As such, the Court concludes that Fanslow has arguably, albeit just barely, raised a factual issue with respect to the first element of an FCA claim. Because Fanslow was aware that CMC received almost half of its funding from NIST, and Fanslow specifically asked a government official about the propriety of using CMC funds to establish MFR.Net, the Court believes a reasonable juror could find that Fanslow was in the initial stages of investigating possible fraudulent misuse of government funds.

### B. Notice to CMC

---

[1] Fanslow frequently offers in his affidavit facts that he did not raise at his deposition. Such a tactic is inappropriate and the Court will disregard his new evidence. *See Rogers v. City of Chicago*, 320 F.3d 748, 751 (7th Cir. 2003) (self-serving affidavit that conflict with prior deposition testimony are inappropriate); *Albeiro v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (self-serving affidavits without factual support in the record do not create genuine issues of material fact).

9

Even if Fanslow establishes that he was engaging in protected activity, he must also show that he placed CMC on notice that of his conduct that might subject CMC to a FCA action. *Luckey*, 2 F. Supp. 2d at 1053. Fanslow can satisfy this element by demonstrating he either expressly or implicitly indicating to CMC that he was assisting the government in a FCA action or contemplating his own private *qui tam* action. *Id.* at 1054. Fanslow contends that CMC became aware that he was investigating its activities when, after the November 1999 conversation, he told the company's top three officers, Giannisis, Panfil and Adams, that a NIST official said CMC was not allowed to use NIST funds for MFR.Net, and in June/July 2000, opposed the use of CMC funds to purchase computers for MFR.Net. The Court must examine whether Fanslow's conduct "was sufficient to put [CMC] on notice of a possible FCA action." *Id.*

Courts have consistently found an employee's conduct insufficient to give the employer notice of an impending fraud investigation where the employee does not "couch her concerns or investigations in terms of funds her employer fraudulently obtained from the government." *Id.* at 1055. *See Brandon*, 277 F.3d at 945 (employer not put on notice where employee's conduct consisted of trying to convince shareholders to comply with medical billing regulations); *Luckey*, 2 F. Supp. 2d at 1056 (employer not on notice where employee's ongoing concerns failed to indicate that she believed employer's blood testing activities were fraudulent); *Hopper v. Anton*, 91 F.3d 1261, 1270 (9th Cir. 1996) (no notice where employee did not indicate she was investigating her employer for defrauding the federal government); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)(no notice where employee never referred to employer's overcharging on government contract as fraudulent or illegal).

Fanslow is correct that through his voiced concerns about the funding of MFR.Net, he placed CMC on notice of his investigation. However, Fanslow failed to sufficiently convey to

10

CMC his belief that its activities were fraudulent. On the two occasions when Fanslow openly questioned the propriety of using CMC funds for MFR.Net, he claimed such action was unallowable. In fact, Fanslow attended a MFR.Net kickoff meeting in July 2000, where he never once raised a single concern about funding, even though members of his IT group asked questions. Indeed, Fanslow concedes that after the kickoff, he never discussed MFR.Net with CMC management again. Fanslow has presented no reliable evidence to show that he ever used the terms illegal, fraudulent, or false in his conversations with CMC management about the funding of MFR.Net. Consequently, Fanslow has failed to satisfy the notice element necessary for a FCA claim.

### C. Retaliatory Intent by CMC

Absent notice by CMC of Fanslow's protected activity, he cannot establish that CMC discriminated against him because of his conduct. *Luckey*, 2 F. Supp. 2d at 1056 (explaining that the discharge must be tied not only to the employee's activities, but also to the employer's knowledge of those activities in furtherance of a FCA action). But even if Fanslow could demonstrate protected activity and the requisite notice, the causal connection is simply not there. Fanslow "bears the burden of producing evidence that demonstrates the probability, not the mere possibility, of a discriminatory motive." *Id.* at 1057.

Fanslow contends that the timing of the retaliation provides a clear nexus since prior to November 1999, he had no performance issues, and had only recently been assigned significant new responsibilities and received a substantial raise. Furthermore, Fanslow maintains, he was hit with a PAP shortly after he refused to purchase computers for MFR.Net with CMC funds. Fanslow, however, conveniently ignores the fact that in October 1999, prior to his alleged "whistle-blowing," Giannisis had emphasized that one of his key goals for the year 2000 involved stabilization of the VAULT system. An unstable, improperly functioning system led

11

to larger problems such as unreliable data and CMC employees being unable to prepare necessary internal and external reports. Fanslow was thus made aware before he ever mentioned the funding of MFR.Net that as IT Director, Giannisis was depending on him to correct the numerous deficiencies in the VAULT system. Indeed, the PAP addressed the need for the IT Director to get the system he was responsible for overseeing up and running properly.

Although Fanslow insists that he alone was not responsible for the system malfunctions, and that the consulting team subsequently confirmed his belief, the Court is concerned not with whether CMC was right or wrong in holding Fanslow accountable for the systems issues. Rather, the Court focuses only on what CMC legitimately believed about Fanslow's performance. *See e.g., Neal*, 33 F.3d at 864 ("an employee who . . . just imagines fraud but lacks proof, legitimately may be sacked"). The record is replete with complaints from Gianissis and other CMC employees detailing problems with the VAULT system that arose prior to November 1999, and continued well into the fall of 2000 when CMC placed Fanslow on a PAP. Given that the computer system frequently crashed, and consistently generated erroneous reports, it is not surprising that CMC blamed the Director of IT for not fixing the problems sooner. As such, the Court finds no evidence of improper motive by CMC with respect to the PAP.

Next, Fanslow claims the grounds for his termination are pretextual because Giannisis told him he was being terminated because he was not happy, but CMC now claims in its summary judgment motion, that his inappropriate behavior and ongoing performance issues led to his discharge. The Seventh Circuit has held that pretext is established where the employer's proferred reasons for discharge are not worthy of belief. *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999); *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998).

Fanslow relies on *Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001), a case in which the Seventh Circuit concluded that where an employer changes its story, a fact finder may infer that the employer is lying about the reasons for termination. *Id.* at 889. However, *Gordon* involved inconsistent definitions of what conduct was unauthorized and the employer was unable to identify the management employee responsible for the characterization that led to the discharge. *Id.* at 893. Furthermore, the reason for the discharge was doubtful in its totality. *Id.*

In contrast to the situation presented in *Gordon*, Fanslow does not dispute that he was actually called into a meeting with Giannisis and Adams, counseled about using profanity towards a subordinate employee, and terminated the very next day. Nor does Fanslow dispute that at the time of the incident, he was subject to a PAP, and still attempting to fix the VAULT system. Fanslow had not even mentioned MFR.Net to CMC management since July 2000. Consequently, the connection between his conversations about MFR.Net in November 1999 and June/July 2000, and subsequent termination for insubordination and performance issues in December 2000 is extremely tenuous. The Court therefore concludes that CMC's motives for the employment actions taken were neither improper nor pretextual. Because Fanslow has not established a causal connection between the PAP or his termination, and CMC's knowledge that he was investigating allegedly fraudulent activity, his retaliatory discharge claim fails.

## II.    Illinois Whistleblower Protection Act

The parties agree that the analysis of claims under the Illinois Whistleblower Protection Act, 740 ILCS 175/4(g), mirrors the FCA. Accordingly, for the all the reasons stated above, Fanslow's state law whistleblower claims likewise fails.

13

### III. Retaliatory Discharge in Violation of Public Policy

Finally, Fanslow contends that his discharge violated Illinois public policy. "A discharged employee may sue her employer for the common law tort of retaliatory discharge if her discharge was in retaliation for certain actions that are protected by the public policy of Illinois, including retaliation for complaints about an employer's unlawful conduct." *Brandon*, 277 F.3d at 940-41. However, as the Court explained *supra*, Fanslow cannot establish the causal connection required to support a claim of retaliation. Therefore, his claim of retaliatory discharge in violation of Illinois public policy fails.

### CONCLUSION

The Court grants summary judgment in favor of CMC on all of Fanslow's claims.

**IT IS SO ORDERED.**

_____
The Honorable John W. Darrah
United States District Court

DATED: March 25, 2003